Good afternoon, Your Honor, Mr. Phelps. I'm Albert Sabin. The core issue of this case is whether a verdict may stand where it rests only on sham facts that were developed on the run and without warning. In this case, the appellee, Samuel Berkowitz, had two propositions to prove. One was that the securities in question, that was supposedly the subject of a forged signature, belonged to him. And the second, that my client, his daughter, forged his signature on the transfer documents of Meg Mason. Both those propositions rest solely on so-called sham facts. The first one, whether these securities were owned at the relevant time, in the original probate proceeding, his third divorce from Mrs. Berkowitz, he filed not one, not two, but three sworn statements disclosing all his assets. You know, but I assume you argued all this in the jury trial. I assume all this was part of the jury trial. It's fact-based, who you believe, and they believed Mr. Berkowitz, not your client. That's true. That's why we're here. The evidence which the jury accepted should never have been allowed. This court and I think virtually every other circuit court has basically held that one cannot prevent dismissal of a case by contradicting sworn testimony, sworn documents that were given at another time or in the same place without a reasonable explanation. Well, he gave an explanation, whether in your view not a reasonable one, but the jury accepted it as a reasonable explanation that when he thought about it, he realized that he did know the daughter's signature. We have depositions all the time, as you know, and you take it up to the fellow and say, didn't you say this then? He said, yeah, I did, but because of that. And isn't that exactly what the jury system does? The jurors decided that they believed the other side, maybe wrongly, but that's what they did. Your Honor, the point of the doctrine that you cannot build a defense on sham facts has been applied several times by this circuit. In summary judgment proceedings. I'm sorry, Your Honor? In summary judgment proceedings. That's correct. But you want it to apply in a trial. Yes. And I haven't tried as many cases as you have, Mr. Zabin, but I don't think I've ever been through a trial where some witness didn't say something that was flatly contradicted by a deposition. I think your question raises two questions. One, does the rule that has been applied with respect to summary judgment apply to motions for directed verdict? And secondly, is it, again, getting back to Judge, I think, reflecting Judge Stahl's question, isn't this a matter for a jury? And the jury just decided, you know, adversely to my client. I think the latter can answer in this respect. I tell clients, you've got a great case. I can try it a hundred times. I'm going to win at 99, but I can't tell you before we start if this is number one or this is 199. So the law has developed rules which require judges to act as gatekeepers to try to avoid the wrong verdict in that 1%, particularly when the evidence that's used to win that 1% is fouled. Can I just question about the premise of that? Because I get the argument why we should have the same standard in a case in which truly the only evidence that could support the verdict was what you call a sham fact that contradicts sworn testimony. But as I read the district court, that's not what she thought the record showed, because the daughter, when asked repeatedly, did not say, I did not forge it. So that's an inference that the jury would be entitled to draw. And then there's all the surrounding facts. So it's just not, it's a necessary fact, maybe, that he testified to recognize in the other way, and all we have to support the verdict is this contradictory statement by one witness. With respect, Your Honor, my client denied signing it, and she said, not that I know of, not that I know of. Which is a little different than I did not do it. I think it's just... Well, but a jury could think otherwise. What I'm just saying is, the district court, as I read her opinion, does not say, you are wrong on the legal proposition that a sham fact argument has no application in the new trial motion. And instead, what I read her to be saying is, there was no surprise, and this is not a true sham fact case, because there was surrounding evidence that also supported the conclusion that the jury made a reasonable inference. And while it's true that there was a contradictory statement, just to Judge Katz's point, that's often true when we look at the trial record, that a piece of the evidence will be something that was subject to being impeached. Okay. Your Honor's question raises three points. Number one, the easy answer to the question of whether her testimony of denials was strong enough is that the disbelief of a witness' testimony is not sufficient to prove the opposite fact. But there was more here, too, because didn't he say it wasn't his signature? I'm sorry, Your Honor. Didn't he say it wasn't his signature? Well... Which he could clearly recognize his own signature. What I'm trying to get across is that the only evidence that proves a positive fact in the appellee's favor was foul. And the only other thing that you point to, even if the fair reading of what she's saying is, hey, I didn't do it because I remember. But another way to think about it would be, I agree with you, that you might say it's a necessary fact. If they don't have anybody saying there was a forgery, maybe this case is elusive. So it was necessary for him to say, I testify to the handwriting. And then you say, that's a sham fact, because he earlier said, I don't recognize it. But that still seems to me a different case than the one we've got here, potentially, because then you want to assess, well, how reasonable is it for the jury to rely on his statement now rather than then? And when you look at the totality of the evidence, I don't see why it's that unreasonable. The other witness who could be contradicting it and has supposedly committed the forgery never says straight out, I did not do it. And then there's the other evidence that suggests surrounding circumstances that would make it possible that she would have done it. So we never really get, I think, to the true sham fact case that you're saying we would be deciding. I understand the point. But this is not just a contradiction. This is one day I don't recognize it until I do, which I did for the first time at trial. This is not a matter of an inconsistent testimony. It comes out, his explanation is, in cross-examination, I had an epiphany in the course of preparation for trial. That's in clear violation of Rule 901.2, I believe. So his explanation should sink his ship. And so what you have here is nothing that ties my client to that signature other than Mr. Berkowitz's say-so. And her non-denial that she might or might not have signed this. And the other problem is in the totality of this case, there's other evidence. There was a son who the father appeared to have a relationship with. The mother appeared not to have one, at least as I understand what I've read thus far. And he gets cut off as a result of what happened here. And so the jury had all these other subsidiary facts together in reaching its decision. And I'm sure you argued all this the other way. Well, with respect, Your Honor, the son is not cut off. My client never took a single dollar out of that fund. And there's no evidence and no suggestion that she might have. She had no reason to forge a signature. And then the case is over. I'm sorry? If your client isn't claiming the money is hers, then what do we have a lawsuit over? You just give them back the money? She doesn't have the money. That's the point. She never took a dollar. So you're saying the mother took all the money? of $540,000 with interest, bringing it up to about $700,000, basically based on a cooked-up piece of testimony against a person who didn't take a dollar. And so where did the money go? Never once. Where did the money go? Well, the money was initially given. And it's reflected in the gift tax return. I can't remember. It's Exhibit 6 or 7 in the probate court. But it was supposedly given to her and to the mother. But the mother was the one for whom that money was to be used. And, in fact, in some of the testimony, Mr. Berkowitz said he thought the money was his wife, his former wife, was the forger. So we've got a situation where a client who has done nothing other than to be, essentially, a joint holder of the fund to take care of her mother, and with no evidence that she took any money, with tainted evidence that the signature is hers, and she's on the hook for money she doesn't have to the tune of $700,000. To let that stand, I submit, Your Honor, would be a judicial joke. Thank you, Mr. Zivit. Thank you. Good afternoon, Your Honors. My name is Jerry Phelps, and I represent Samuel Berkowitz. May it please the Court. We've had a lot of conversation or argument about the forgery aspects of this case. Whether or not the document was forged, I would submit to you, isn't conclusive of the case whatsoever. The thing that my brother is ignoring is the fact that there was a finding that there was a resulting trust. If there had been a forgery, then a constructive trust would have been imposed upon those proceeds. But those findings that there was a resulting trust, and there was an abundance of evidence to support the jury's finding of a constructive trust. And wasn't the purpose of the trust, under your theory, to take care of the mother? That's why he conveyed money to her? Well, if he did not survive, then he would expect that X, Y, and Z would happen. I see. But he survived. That's what the lawsuit was all about. In finding a resulting trust as opposed to a constructive trust, the jury only had to find a lack of intent on the part of my client to give the property to his daughter outright. As your Honor has noted, there was an abundance of testimony to the effect that he had a son, that he had actually given money to his son, and that money was returned by his son, that he loved his son equally with his daughter, and that he wanted to take care. But the jury on those facts alone could have found a resulting trust. Why shouldn't we hold him? He goes into a divorce proceeding, and he's required to list his assets, including any assets that are beneficially held. And he leaves these out. He doesn't leave them. Why should he be able to get away with that, not claim them when claiming them would hurt him, and then come over here and tell us they're his? Correct, Your Honor. I would submit, Your Honor, that he didn't leave them out. His divorce lawyer, Mr. Kreswick, testified at the trial in this case that, first of all, the subject matter of these securities and the one half being held by the defendant, Bonnie Berkowitz, was negotiated in the course of the divorce and settlement agreement. And he testified, and he was referencing Exhibit W that was marked for identification during the trial, the divorce and separation agreement, where the adjective was placed in front of the Morgan Stealing Accounts to differentiate the fact that my client still held claim to the securities that were being held by his daughter. Mr. Kreswick also testified that the entire value of the accounts was already placed or reported in the 401 financial statement of the wife, and to do it again on Mr. Berkowitz's financial statement would have been duplicitous. Now, whether that's right or wrong, that was an experienced divorce lawyer's determination that it wasn't necessary. The other thing is the case was settled. These securities were addressed, and most notably, Ronna, the attorney that represented the mother in the course of the divorce was never called as a witness to rebut anything. There was never any rebuttal to any of the testimony that was given by Mr. Kreswick, my client's divorce attorney. Your Honor, I'm going to rely on my brief for my response brief. I have a cross appeal relative to how the calculation of interest, in this case, should be made. I would submit based on a recent Supreme Judicial Court decision in the Woodward School case that my client is entitled to interest at 12% for the day of the breach of fiduciary duty. Doesn't that case suggest that interest in a case like this would be an element of damages? It did, but it's an element of damages that — But that dooms you, doesn't it? That means you needed to ask the jury for it. In fact, there's a federal case saying the same thing, and so the jury didn't award it to you. I can hear the argument, Your Honor, but it's really a question of putting the court invoking its equitable powers after the actual damages are found to put my client in the place that it would have been using that 12% rate. I briefed it thoroughly in my brief, and I would submit that there's a distinction. I don't understand how it works. You wouldn't typically raise that below first? Well, the interest, the 12% interest, that's actually, I'm going to use the word, ministerial act. That's performed by the clerk. That's done by the clerk. Right. Correct. But if you think the clerk's done it wrong, you come straight to the Court of Appeals, you don't go to the district court? I'm sorry, Your Honor, I'm too off. Well, the judge is going to make a determination as to what the starting date is, whether it's the date of filing, whether it's the date of the breach of contract, or whether it's the date of the breach of fiduciary duty. And you're contesting how the judge made that? Correct. Yeah. But you don't give a, did you ever make an argument to the judge that he was using the wrong date? Just, I believe in one of my motions, I did, yes. Below, you did? Yes. I asked for that. For a different date? When I filed, yes. I see. Excuse me. When I filed my motion for entry of the judgment, that was explicitly set for one. Thank you. Thank you, Mr. Phelps.